IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RAYNE SOLEIL BONNEY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | ______________________ |
| v. | ) | |
| | ) | **DEMAND FOR JURY** |
| | ) | **TRIAL** |
| MTW AEROSPACE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Rayne Soleil Bonney ("Plaintiff" or "Ms. Bonney") files this Complaint against Defendant MTW Aerospace, Inc. ("MTW") and alleges as follows:

## NATURE OF THE ACTION

1. This is an employment-discrimination and retaliation action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); and Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq. ("ADA").

2. Ms. Bonney, a woman of African ancestry, the race colloquially referred to as Black, worked for MTW as an Inventory Specialist from July 8, 2024 until MTW fired her on July 18, 2025.

3. On June 12, 2025, in a meeting with MTW's Production Manager and her supervisor, Ms. Bonney asked whether she was being treated differently because she is Black and a woman. Thirty-six days later, MTW fired her without giving any reason other than that she was "not a good fit," and later told the State's unemployment agency that she was fired for attendance.

4. Ms. Bonney seeks back pay, front pay or reinstatement, compensatory and punitive damages, declaratory and injunctive relief, attorney's fees, costs, and interest.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, and under 28 U.S.C. § 1343(a)(4) because it seeks to recover damages and equitable relief under Acts of Congress providing for the protection of civil rights. Title VII's enforcement provision, 42 U.S.C. § 2000e-5(f)(3), which the ADA incorporates through 42 U.S.C. § 12117(a), also confers jurisdiction.

6. Venue is proper in this District and Division under 28 U.S.C. § 1391(b)(1) and (2) because MTW's principal place of business and the

events giving rise to these claims occurred at MTW's facility at 7050 Highway 80 West, Montgomery, Montgomery County, Alabama, which lies in the Northern Division of the Middle District of Alabama. 28 U.S.C. § 81(b)(1).

7. Venue is also proper under 42 U.S.C. § 2000e-5(f)(3), as incorporated for the ADA claim by 42 U.S.C. § 12117(a), because the unlawful employment practices alleged here were committed in Alabama, MTW maintains Ms. Bonney's employment records in Alabama on information and belief, and Ms. Bonney would have continued working in Montgomery, Alabama but for those practices.

## PARTIES

8. Plaintiff Rayne Soleil Bonney is an adult resident of Montgomery, Montgomery County, Alabama.

9. Defendant MTW Aerospace, Inc. is an Alabama corporation (Alabama Secretary of State Entity ID 000-213-879) with its principal office at 7050 Highway 80 West, Montgomery, Alabama 36108.

10. MTW buys and sells aircraft, aircraft parts, and aviation inventory, and is engaged in an industry affecting commerce.

11. At all relevant times, MTW employed approximately 35 employees, and on information and belief employed fifteen or more employees for each working day in twenty or more calendar weeks in 2024 and in 2025.

12. MTW is an "employer" within the meaning of 42 U.S.C. § 2000e(b) and a "covered entity" and "employer" within the meaning of 42 U.S.C. § 12111(2) and (5)(A).

13. At all relevant times, Ms. Bonney was MTW's "employee" within the meaning of 42 U.S.C. § 2000e(f) and 42 U.S.C. § 12111(4).

## ADMINISTRATIVE EXHAUSTION

14. Ms. Bonney filed a Charge of Discrimination against MTW with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 420-2025-05188, on September 22, 2025. The Charge is attached as Exhibit A and incorporated by reference.

15. The Charge alleged that MTW discriminated against Ms. Bonney because of her race and sex, retaliated against her for her June 12, 2025, complaint of discrimination, and discriminated against her in violation of the ADA because of her daughter's disability.

16. MTW terminated Ms. Bonney on July 18, 2025, sixty-six days before the Charge was filed. Each discrete act on which the Title VII and ADA counts rests (the June 10, 2025, written warning, the post-June 12, 2025, workload increase and vacation denial, and the July 18, 2025, termination) occurred within 180 days before the Charge was filed.

17. On July 22, 2026, the EEOC issued a Notice of Right to Sue. The Notice of Right to Sue is attached as Exhibit B and incorporated by reference.

18. Ms. Bonney filed this action within ninety days of receiving the Notice of Right to Sue, as 42 U.S.C. § 2000e-5(f)(1) requires.

19. All conditions precedent to the Title VII and ADA claims have been performed, have occurred, or have been excused.

20. The Section 1981 claims do not require administrative exhaustion.

## FACTUAL ALLEGATIONS

### A. Ms. Bonney's hiring and the inventory department

21. On June 4, 2024, Michael White interviewed Ms. Bonney for MTW's Inventory Specialist position.

22. Michael White is the son of MTW's owner, Phil White, and holds a position above MTW's Production Manager.

23. During the interview, Michael White told Ms. Bonney, "now the supervisor is Swedish."

24. MTW hired four people into the inventory department in July 2024: one White man and three Black women, including Ms. Bonney.

25. MTW hired Ms. Bonney as an Inventory Specialist effective July 8, 2024, at $19.00 per hour for a 40-hour work week.

26. Ms. Bonney's duties included transfer of custody, inspection of parts and tags, sales photography, stock monitoring, traceability and preservation of parts, discrepancy resolution, inventory audits, regulatory compliance, data entry, reporting, and parts research.

27. When Ms. Bonney started, every existing member of the inventory department was white.

28. The exiting members of the inventory department were: Inventory Supervisor Robert Kertis, Forrest (last name unknown), Jeremy (last name unknown), Conar Reeves, and Danielle Hughes.

29. Robert Kertis is from Sweden and was Ms. Bonney's direct supervisor throughout her employment.

30. David Schneider was MTW's Production Manager and the manager above Mr. Kertis.

**B. Ms. Bonney excels in training**

31. Mr. Kertis trained Ms. Bonney one-on-one using a training program he wrote, and he referred to her as his "guinea pig."

32. Mr. Kertis told Ms. Bonney he was surprised at how quickly she was learning the material.

33. In early October 2024, Ms. Bonney passed the QMS test that MTW requires every employee to take at the end of the first ninety days, with a score of 100%.

34. After passing the QMS test, Ms. Bonney was given access to MTW's live inventory system and her own desk.

35. On information and belief, Ms. Bonney received positive performance evaluations during her employment.

**C. Ms. Bonney becomes the only Black employee in the department**

36. In October 2024, the two other Black women hired with Ms. Bonney left MTW.

37. From October 2024 until her termination, Ms. Bonney was the only Black employee in MTW's inventory department.

38. In November 2024, Ranee Savage and Bridget Strength, both white women, joined the inventory office.

39. After Conar Reeves left MTW on January 31, 2025, the inventory office consisted of four women, all supervised by Mr. Kertis.

**D. Mr. Kertis singles out Ms. Bonney**

40. Once Ms. Bonney had her own desk, Mr. Kertis micromanaged her work every day.

41. Mr. Kertis repeatedly compared Ms. Bonney to Ambrosia, a Black woman who had previously worked in the department and whom Ms. Bonney had never met.

42. In making those comparisons, Mr. Kertis criticized Ambrosia's data-entry mistakes, said she was always late, and said she was tired at work because she braided hair at night.

43. Mr. Kertis told Ms. Bonney he did not want her to make the same mistakes Ambrosia made. Ms. Bonney responded that she and Ambrosia were different people.

44. On one morning, Mr. Kertis told Ms. Bonney to go home because she was eating breakfast at her desk, although other employees ate at their desks.

45. Ms. Bonney went to Mr. Schneider, who told her to go back downstairs and eat her breakfast.

46. Mr. Kertis told Ms. Bonney, "Don't be too eager to climb the corporate ladder," and on other occasions told her not to be so hungry to climb the corporate ladder.

**E. Comments about black people.**

47. After the two other Black women hired with Ms. Bonney left in October of 2024, Ms. Bonney heard coworkers describe the two Black women as having poor "work ethic" and "bad attitudes."

48. Black women often find themselves navigating a complex landscape of stereotypes and biases.

49. One prevalent detrimental characterization of a black woman is that of the "angry black woman".

50. Laziness is a stereotype that is historically assigned to black individuals.

51. Ms. Bonney believed describing these two black woman as having "bad attitudes" and "having poor work ethic" was racist.

52. When President Trump entered office, the Production Manager David Schneider walked around the office with a shirt with President Trump's face on it.

53. David Schneider tried to get Ms. Bonney to look at it, but it made her feel uncomfortable.

54. According to the Washington Post-Ipsos poll, more than 8 in 10 African Americans believe President Donald Trump is racist and that he contributing to making racism a bigger problem in the United States.

55. In a recent poll from The Economist/YouGov conducted in February of 2026, nearly half, 47 percent, said they would use the word racist to describe the President, 29 percent expressed no opinion, and the remainder said they would not.

56. President Trump has been widely criticized over his public statements such as: blaming "both sides" after violence sparked by a neo-Nazi rally in

Charlottesville, Virginia; privately referring to some African nations as "s***hole countries"; lambasted the protests led overwhelmingly by black NFL players; and told four congresswomen of color to "go back" to where they came from.

57. At MTW's company Christmas dinner in December 2024, Mr. Schneider asked Ms. Bonney whether she liked donkeys and told her how obedient and smart the animal was, and she felt like this was a racist comment.

58. Historically, black people have been referred to as animals, including donkeys, to demean and dehumanize them particularly in the context of slavery and racial stereotypes.

**F. Comments about women and single mothers**

59. MTW's Production Manager, David Schneider, referred to the all-women inventory office as the "hen house."

60. The term "hen house" can refer to a gathering place for women, often used in a derogatory sense to imply gossiping or trivial behavior.

61. Mr. Kertis told Ms. Bonney, "You're a woman so that['s] why you feel this way."

62. Mr. Kertis repeatedly brought up that Ms. Bonney was a single mother, telling her, "You're a single mom so you have to do what you have to do."

63. Mr. Schneider commented on Ms. Bonney and Ms. Strength being single mothers.

64. MTW supervisors discussed that the women in the inventory office were mostly mothers, remarked that they did not know how women could work full time and take care of children, and remarked that Swedish women get time off to take care of their children.

**F. Ms. Bonney's daughter's scoliosis**

65. Scoliosis is a sideways curvature of the spine, which can cause chronic back pain and breathing problems as compared to individuals who do not suffer from the condition.

66. Ms. Bonney's minor daughter, K., was diagnosed with scoliosis.

67. On July 16, 2024, K's pediatrician sent her for imaging after her doctor's appointment.

68. That day, Ms. Bonney called Mr. Kertis and told him she needed to miss the rest of the workday to take her daughter for X-rays.

69. K. has been under a physician's care for scoliosis continuously since July 16, 2024.

70. K.'s scoliosis has caused severe pain that required an emergency-room visit and an MRI, has required care by specialists in Birmingham, Alabama, and has required physical therapy prescribed three times a week.

71. Between November 2024 and May 2025, Ms. Bonney requested time off for K.'s medical appointments. She entered each request in MTW's ADP timekeeping system, and MTW approved each one.

72. To get K. to physical therapy, Ms. Bonney needed to leave work at 3:00 p.m. on Wednesdays and Fridays.

73. Ms. Bonney asked to work through her lunch break or stay late to make up that time.

74. Mr. Schneider denied the request after consulting MTW's Human Resources Manager.

75. MTW permitted other employees who had appointments to shorten their lunch breaks to make up time.

**G. A white coworker's attendance**

76. Bridget Strength, a white woman who worked in the same office under Mr. Kertis, arrived late for work almost every day.

77. Ms. Strength took thirty-minute smoke breaks and took days off when her own daughter was absent from school.

78. On information and belief, MTW did not fire Ms. Strength, and she remained employed by MTW after July 18, 2025.

**H. The June 10, 2025, warning**

79. On June 10, 2025, in a meeting attended by Michael White, MTW gave Ms. Bonney a written warning, labeled a "Second Warning," for absences and tardiness.

80. The warning asserted that Ms. Bonney had about 175 hours of unpaid absence between January and June 2025.

81. MTW had never given Ms. Bonney a first warning.

82. Ms. Bonney told MTW that the time off it was counting had been requested in advance, entered in ADP, and approved, and that it was time she took to care for K.

**I. Ms. Bonney complains of race and sex discrimination on June 12, 2025**

83. On June 12, 2025, shortly before clocking out for lunch, Ms. Bonney was helping her coworker Danielle Hughes break down boxes in the warehouse.

84. Mr. Kertis walked in, told Ms. Bonney she needed to be doing what she was told, raised his hand to her face, and told her to stop speaking.

85. Ms. Bonney said they needed mediation and walked upstairs to Mr. Schneider's office. Mr. Kertis followed her, saying, "we don't need mediation."

86. In Mr. Schneider's office, Mr. Kertis told Mr. Schneider that Ms. Bonney wanted to do what she wanted to do, did not listen to his instructions, and was "combative."

87. Mr. Kertis also told Mr. Schneider there was a "language barrier" because he is from Sweden.

88. Ms. Bonney responded that Mr. Kertis had personally trained her one-on-one for nearly a year and that she had completed every task he assigned in a timely manner.

89. Ms. Bonney then asked, in front of Mr. Schneider and Mr. Kertis, whether she was being treated this way because she is Black and because she is a woman..

90. Mr. Kertis became angry when Ms. Bonney raised her race and gender.

91. The meeting lasted about forty-five minutes. Mr. Schneider concluded that the incident was a misunderstanding and told Ms. Bonney to check with Mr. Kertis before doing anything.

92. On information and belief, MTW did not investigate Ms. Bonney's complaint that she was being treated differently because of her race and sex.

**J. MTW's treatment of Ms. Bonney after June 12, 2025**

93. After June 12, 2025, MTW assigned Ms. Bonney a heavier workload, including warehouse work and pulling parts, that was outside her normal duties.

94. About a month earlier, Ms. Bonney had requested vacation for June 30 through July 3, 2025.

95. In late June 2025, after the June 12 meeting, MTW denied the vacation request except for July 1, telling Ms. Bonney that she had taken "too much time off" that year.

96. Ms. Bonney had not taken any vacation in 2025. The time off MTW counted was approved time she took for K.'s medical care.

97. Ms. Hughes, Ms. Savage, and Mr. Schneider each took vacation in the summer of 2025.

98. On or about July 3, 2025, Mr. Kertis sat on Ms. Bonney's desk while she worked. When she told him she could not concentrate with him watching over her shoulder, he answered, "I know and I'm going to sit here until you're done."

99. On information and belief, Mr. Kertis had been the subject of prior complaints to MTW's Human Resources department, including about how he spoke to women.

**K. MTW fires Ms. Bonney**

100. On Friday, July 18, 2025, MTW terminated Ms. Bonney's employment.

101. MTW told Ms. Bonney that it was her last day and that she was "not a good fit" for MTW.

102. Ms. Bonney asked what policy she had violated. MTW identified no policy violation and gave no other reason.

103. When Ms. Bonney pressed for a reason, Mr. Schneider told her she was smart and a good person with a good heart.

104. When Ms. Bonney asked whether Michael White knew about the decision, MTW's representatives told her that MTW does not do anything without the owner's knowledge.

105. MTW fired Ms. Bonney thirty-six days after she asked whether she was being treated differently because she is Black and a woman.

106. After the termination, MTW told the State of Alabama's unemployment-compensation agency that it had fired Ms. Bonney for attendance, tardiness, and absenteeism.

107. The absences MTW cited consisted of time off that Ms. Bonney had requested in advance and that MTW had approved, taken to care for K.

108. On information and belief, Mr. Schneider and Mr. Kertis, each of whom was present for Ms. Bonney's June 12, 2025, complaint, participated in or influenced the decision to terminate her, with the knowledge of MTW's ownership.

109. On information and belief, MTW replaced Ms. Bonney or redistributed her duties to employees who are not Black.

**L. Harm to Ms. Bonney**

110. As a result of MTW's conduct, Ms. Bonney has lost wages and employment benefits, and will continue to lose them.

111. As a further result of MTW's conduct, Ms. Bonney has suffered emotional distress, including anxiety, humiliation, and the experience of being silenced and belittled at work.

112. MTW acted with malice or with reckless indifference to Ms. Bonney's federally protected rights: managers who knew of her complaint of race and sex discrimination, and who on information and belief were aware of prior complaints about Mr. Kertis, failed to investigate and instead fired her within weeks without a stated reason, with the knowledge of MTW's ownership.

**COUNT I**
**RACE DISCRIMINATION — TITLE VII, 42 U.S.C. § 2000E-2(A)(1)**
**(TERMINATION)**

113. Ms. Bonney incorporates by reference the factual allegations in ¶¶ 21–58, 76-78, 83-92, and 105-112 as if fully set out herein. In addition, Ms. Bonney states the following:

114. Ms. Bonney is a woman of African ancestry and a member of a protected class under Title VII.

115. Ms. Bonney was qualified for her position: she passed MTW's required QMS test with a score of 100%, her supervisor remarked on how quickly she learned, and when MTW fired her its Production Manager told her she was smart and a good person with a good heart.

116. MTW subjected Ms. Bonney to an adverse employment action when it terminated her employment on July 18, 2025.

117. MTW discharged Ms. Bonney because of her race, in violation of 42 U.S.C. § 2000e-2(a)(1).

118. The circumstances support an inference of race discrimination, including that:

(a) from October 2024 forward Ms. Bonney was the only Black employee in the department;

(b) her supervisor repeatedly measured her against a former Black employee whom he disparaged for lateness, mistakes, and braiding hair at night;

(c) after the other two Black women hired with her left, coworkers described them as having poor "work ethic" and "bad attitudes";

(d) making her look at a T-shirt that depicted President Trump;

(e) her Production Manager asked her whether she liked donkeys and told her how obedient the animal was;

(f) MTW retained Ms. Strength, a white woman in the same office under the same supervisor who arrived late almost daily and took days off for her own daughter;

(g) MTW gave Ms. Bonney no reason when it fired her and later told the State's unemployment agency that the reason was attendance;

(h) the attendance after the fact MTW cited consisted of absences it had approved; and

(i) upon information and belief Ms. Bonney was replaced with a white woman.

119. Ms. Bonney's race was, at a minimum, a motivating factor in MTW's decision to terminate her. 42 U.S.C. § 2000e-2(m).

120. MTW acted with malice or with reckless indifference to Ms. Bonney's federally protected rights.

121. As a direct result, Ms. Bonney has suffered lost wages and benefits and emotional distress, and is entitled to the relief requested below.

**COUNT II**
**RACE DISCRIMINATION — 42 U.S.C. § 1981**
**(TERMINATION)**

122. Ms. Bonney incorporates by reference the factual allegations in ¶¶ 21–58, 76-78, 83-92, and 105-112 as if fully set out herein. In addition, Ms. Bonney states the following:

123. Ms. Bonney is a woman of African ancestry, a racial minority protected by Section 1981.

124. Ms. Bonney had a contractual employment relationship with MTW, under which she worked as an Inventory Specialist in exchange for wages of $19.00 per hour.

125. Section 1981 guarantees Ms. Bonney the same right to make and enforce contracts, including the making, performance, modification, and termination of her employment contract, as is enjoyed by white citizens. 42 U.S.C. § 1981(a)–(b).

126. MTW intentionally terminated Ms. Bonney's employment contract on July 18, 2025 because of her race.

127. But for Ms. Bonney's race, MTW would not have terminated her. MTW kept Ms. Strength, a white woman in the same office under the same

supervisor whose attendance was worse, while firing Ms. Bonney who was the only Black employee in the department without a reason and later attributing the firing to approved absences.

(a) from October 2024 forward Ms. Bonney was the only Black employee in the department;

(b) her supervisor repeatedly measured her against a former Black employee whom he disparaged for lateness, mistakes, and braiding hair at night;

(c) after the other two Black women hired with her left, coworkers described them as having poor "work ethic" and "bad attitudes";

(d) making her look at a T-shirt that depicted President Trump;

(e) her Production Manager asked her whether she liked donkeys and told her how obedient the animal was;

(f) MTW retained Ms. Strength, a white woman in the same office under the same supervisor who arrived late almost daily and took days off for her own daughter;

(g) MTW gave Ms. Bonney no reason when it fired her and later told the State's unemployment agency that the reason was attendance;

(h) the attendance after the fact MTW cited consisted of absences it had approved; and

(i) upon information and belief Ms. Bonney was replaced with a white woman.

128. MTW acted with malice or with reckless indifference to Ms. Bonney's federally protected rights.

129. As a direct result, Ms. Bonney has suffered lost wages and benefits and emotional distress, and is entitled to the relief requested below.

## COUNT III
## RETALIATION — TITLE VII, 42 U.S.C. § 2000E-3(A)

130. Ms. Bonney incorporates by reference the factual allegations in ¶¶ 21-58, and 76-112. In addition, Ms. Bonney states the following:

131. On June 12, 2025, Ms. Bonney engaged in activity protected by 42 U.S.C. § 2000e-3(a) when she asked MTW's Production Manager and her supervisor whether she was being treated differently because she is Black and because she is a woman, opposing practices she reasonably and in good faith believed violated Title VII.

132. Ms. Bonney's belief was objectively reasonable: she was the only Black employee in the department; her supervisor had just raised his hand to her face and told her to stop speaking; he had repeatedly compared her to a former Black employee he disparaged; he wore clothing supporting an individual whom the black community considers to be racist, and he told her how he liked donkeys

which is an animal that has historically been associated with slavery, and he and other managers had made remarks about her being a woman and a single mother.

133. Mr. Schneider and Mr. Kertis knew of Ms. Bonney's protected activity because she made her complaint directly to them.

134. After her complaint, MTW took materially adverse actions against Ms. Bonney that would dissuade a reasonable worker from making or supporting a charge of discrimination: it increased her workload with work outside her normal duties; it denied her previously requested vacation claiming stating she had taken "too much time off" when all of her time off was approved leave to care for her daughter; and on July 18, 2025, thirty-six days after her complaint, it terminated her.

135. But for Ms. Bonney's June 12, 2025 complaint, MTW would not have taken those actions. The causal connection is shown by the close timing; by Mr. Kertis's anger when she raised race and gender; by his conduct on or about July 3, 2025; by MTW's failure to give any reason at the time of termination; and by MTW's later, different explanation to the unemployment agency relying on absences it had approved.

136. MTW acted with malice or with reckless indifference to Ms. Bonney's federally protected rights.

137. As a direct result, Ms. Bonney has suffered lost wages and benefits and emotional distress, and is entitled to the relief requested below.

**COUNT IV**
**RETALIATION — 42 U.S.C. § 1981**

138. Ms. Bonney incorporates by reference the factual allegations in ¶¶ 21-58, and 76-112. In addition, Ms. Bonney states the following:

139. Section 1981 prohibits an employer from retaliating against an employee for opposing race discrimination in the making, performance, or termination of an employment contract.

140. On June 12, 2025, Ms. Bonney opposed race discrimination when she asked MTW's Production Manager and her supervisor whether she was being treated differently because she is Black and stated that Black women were working under Mr. Kertis.

141. Ms. Bonney's belief that she was being treated differently because of her race was reasonable and held in good faith: she was the only Black employee in the department, and her supervisor had repeatedly compared her to a former Black employee he disparaged, he wore clothing supporting an individual whom the black community considers to be racist, and he told her how he liked donkeys which is an animal that has historically been associated with slavery.

142. Mr. Schneider and Mr. Kertis knew of Ms. Bonney's opposition because she voiced it directly to them, and Mr. Kertis became angry when she raised her race.

143. After her complaint, MTW increased Ms. Bonney's workload with work outside her normal duties, denied her requested vacation, and on July 18, 2025, only thirty-six days later, terminated her employment.

144. But for Ms. Bonney's opposition to race discrimination, MTW would not have taken those actions, as shown by the close timing, Mr. Kertis's anger, MTW's failure to state any reason at the time of termination, and its later reliance on absences it had approved.

145. MTW acted with malice or with reckless indifference to Ms. Bonney's federally protected rights.

146. As a direct result, Ms. Bonney has suffered lost wages and benefits and emotional distress, and is entitled to the relief requested below.

## COUNT V
## SEX DISCRIMINATION — TITLE VII, 42 U.S.C. § 2000E-2(A)(1) (TERMINATION)

147. Ms. Bonney incorporates by reference the factual allegations in ¶¶ 21-46, and 59-112 as if fully set out herein. In addition, Ms. Bonney states the following:

148. Ms. Bonney is a woman, a member of a class protected by Title VII.

149. Ms. Bonney was qualified for her position, as shown by her 100% score on MTW's required QMS test and her Production Manager's statement at termination that she was smart and a good person with a good heart.

150. MTW terminated Ms. Bonney's employment on July 18, 2025.

151. MTW discharged Ms. Bonney because of her sex, including sex-based assumptions about women with caregiving responsibilities, in violation of 42 U.S.C. § 2000e-2(a)(1).

152. The circumstances support an inference of sex discrimination, including that:

(a) MTW's Production Manager called the all-women inventory office the "hen house";

(b) Ms. Bonney's supervisor told her she felt the way she did because she is a woman;

(c) her supervisor repeatedly raised that she was a single mother, telling her she had to "do what [she had] to do," and her Production Manager commented on her being a single mother;

(d) supervisors questioned how women could work full time while caring for children;

(e) MTW refused to let Ms. Bonney make up time for her child's physical therapy by working through lunch, a courtesy it gave other employees;

(f) MTW denied her vacation on the stated ground that she had taken "too much time off," when the time off was approved time for her child's care; and

(g) MTW gave no reason when it fired her and later attributed the firing to previously approved absences.

153. Ms. Bonney's sex was, at a minimum, a motivating factor in MTW's decision to terminate her. 42 U.S.C. § 2000e-2(m).

154. MTW acted with malice or with reckless indifference to Ms. Bonney's federally protected rights.

155. As a direct result, Ms. Bonney has suffered lost wages and benefits and emotional distress, and is entitled to the relief requested below.

## COUNT VI
## ASSOCIATIONAL DISCRIMINATION — ADA, 42 U.S.C. § 12112(A), (B)(4)

156. Ms. Bonney incorporates by reference the factual allegations in ¶¶21-22, 25-26, 28-35, 65-82, and 93-112. In addition, Ms. Bonney states the following:

157. The ADA prohibits a covered entity from discriminating against a qualified individual, including by excluding or otherwise denying equal jobs or benefits to that individual, because of the known disability of an individual with

whom the qualified individual is known to have a relationship or association. 42 U.S.C. § 12112(a), (b)(4).

158. Ms. Bonney's daughter, K., has a disability within the meaning of 42 U.S.C. § 12102: scoliosis, a physical impairment of the musculoskeletal system that substantially limits one or more of her major life activities as compared to most people in the general population which effects her with pain and difficulty breathing.

159. Ms. Bonney is a qualified individual: she could perform, and did perform, the essential functions of the Inventory Specialist position, passing MTW's required QMS test with a score of 100%, and timely completing all tasks assigned to her.

160. MTW knew of K.'s disability. Ms. Bonney told her supervisor of the diagnosis on July 16, 2024, and from November 2024 through May 2025 MTW approved her requests for time off for K.'s medical appointments and was told K. needed physical therapy three times a week.

161. MTW knew of Ms. Bonney's relationship with K. as K.'s parent.

162. MTW terminated Ms. Bonney on July 18, 2025.

163. MTW terminated Ms. Bonney because of K.'s known disability, including because MTW assumed that Ms. Bonney would need further time away from work or would be distracted by K.'s ongoing medical care. MTW's own

statements show this: it denied her vacation because she had taken "too much time off" when the only time off she had taken was for K.'s care, and after firing her it told the State's unemployment agency that the reason was her absences which were absences it had approved for K.'s care.

164. MTW acted with malice or with reckless indifference to Ms. Bonney's federally protected rights.

165. As a direct result, Ms. Bonney has suffered lost wages and benefits and emotional distress, and is entitled to the relief requested below.

## PRAYER FOR RELIEF

Ms. Bonney respectfully requests that the Court enter judgment in her favor and against MTW on each count and award the following relief.

**Equitable relief, to be determined by the Court (all counts):**

a. A declaration that MTW's conduct violated Title VII, Section 1981, and the ADA as alleged in Counts I through VI;

b. A permanent injunction prohibiting MTW from engaging in race discrimination, sex discrimination, associational disability discrimination, and retaliation, and requiring appropriate training and policies;

c. Back pay, with lost employment benefits, from July 18, 2025 through judgment;

d. Reinstatement to her former position with full seniority or, if reinstatement is not feasible, front pay;

e. Prejudgment and post-judgment interest;

**Legal relief, to be determined by the jury:**

f. Compensatory damages for emotional distress, humiliation, inconvenience, and other non-pecuniary losses;

g. Punitive damages;

**Fees, costs, and other relief:**

h. Reasonable attorney's fees, expert fees, and costs, and

i. Such other relief as the Court finds just and proper.

**JURY DEMAND**

Under Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Patricia Gill
Patricia Gill (ASB-0780-I66P)

THE WORKERS' FIRM, LLC
2 North 20th Street, Suite 900
Birmingham, Alabama 35203
Tel: (205) 329-6392
Fax: (205) 631-4130
trish@theworkersfirm.com

Attorney for Plaintiff
Rayne Soleil Bonney

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL OR PROCESS SERVER AT:**

MTW Aerospace, Inc.
c/o F P White, Registered Agent
161 Grouby Airport Road
Prattville, Alabama 36067

**EXHIBITS**

Exhibit A — EEOC Charge of Discrimination No. 420-2025-05188 (redacted)
Exhibit B — EEOC Notice of Right to Sue, issued July 22, 2026